IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 16-cv-02106-WYD-MEH

DANIELLE MARKS,

Plaintiff,

v.

JEFF SESSIONS, United States Attorney General, United States Department of Justice,

Defendant.

---

**ORDER**

---

I.  INTRODUCTION

THIS MATTER comes before the Court on Defendant United States Attorney General, Jeff Sessions' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 18), filed December 19, 2016. Plaintiff Danielle Marks filed a Response (ECF No. 36) on January, 19, 2017 and Defendant filed a Reply (ECF No. 44) on February 2, 2017. Specifically, Defendant seeks to dismiss Plaintiff's Amended Complaint (ECF No. 7) pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state sex discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Additionally, Defendant also seeks the dismissal of Plaintiff's hostile work environment claim for failure to timely exhaust administrative remedies.

By way of background, Plaintiff Danielle Marks, a former female special agent ("SA") of the United States Federal Bureau of Investigation ("FBI"), alleges that she was discriminated against, harassed, and ultimately constructively discharged from her

1

employment at the FBI.  Plaintiff transferred to the FBI's Denver Division in January 2013, where she was assigned to the Metro Gang Task Force ("MGTF").  (Am. Compl., ECF No. 7 at ¶¶ 1, 12).  Even before Plaintiff's transfer, Assistant Special Agent in Charge ("ASAC") Mike Rankin stated that the environment in the Denver Division was "tough."  (Am. Compl. ¶ 9).  Plaintiff alleges that there were six special agents assigned to the MGTF.  (*Id.* at ¶ 14).  Supervisory Special Agent ("SSA") Todd Wilcox and ASAC Rankin were the FBI agents who oversaw operations at the Denver MGTF.  (*Id.* at ¶ 16). Plaintiff's first and only Performance Appraisal Rating was "Successful."  (*Id.* at ¶ 17). Plaintiff alleges that she experienced a hostile work environment replete with inappropriate sexual comments.  (*Id.* at ¶ 19).  Most of the conduct Plaintiff alleges she endured was perpetrated by three male SAs, Sanin, Tobar, and Alexander.  (*Id.* at ¶ 22).   As a result of the hostile work environment, Plaintiff tendered her resignation on September 15, 2014.  (*Id.* at ¶ 71).  For purposes of adjudicating this Motion to Dismiss, the allegations contained in Plaintiff's Amended Complaint are treated as true and construed in the light most favorable to the Plaintiff.

II.     ANALYSIS

    **A. Standard of Review**

The parties submitted an evidentiary item—the 2014 Charge. The parties agree that it is referenced in the Complaint and that the Court may consider this evidence without converting the motion to one for summary judgment.  *See Jacobsen v. Desert Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (explaining that a "court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim, and the parties do not dispute the documents' authenticity"); *see also Toone v.*

*Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013)).  Accordingly, the Court analyzes the motion pursuant to Rule 12(b)(6) and does not convert the motion to one for summary judgment.

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in *Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true."  *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).  Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."  *Id.* (internal quotations omitted).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."  *Id.*  "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds

of the claim against them." *Id.* at 1248. Therefore, "a plaintiff must include enough facts to 'nudge[] [his] claims across the line from conceivable to plausible.'" *Dennis v. Watco Cos., Inc.*, 631 F.3d 1303, 1305 (10th Cir. 2011) (quotation omitted). Conclusory allegations are not sufficient to survive a motion to dismiss. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009).

### B. Failure to Exhaust

Defendant first argues that Plaintiff has failed to administratively exhaust her claim of hostile work environment claim under Title VII. "[A]dministrative remedies generally must be exhausted as to each discrete instance of discrimination or retaliation." *Wickware v. Manville*, 676 F. App'x 753, 768 (10th Cir. 2017). Before filing a formal EEOC complaint, an aggrieved employee must contact an EEOC "[c]ounselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *see Mobley v. Donahoe*, 498 F. App'x 793, 798 (10th Cir. 2012). As an FBI Agent, Plaintiff Marks was required to "initiate contact with an EEO Counselor within 45 days of the alleged discriminatory conduct. The 45–day period can be extended under certain circumstances, such as "when the individual shows ... that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred." *Id*. § 1614.105(a)(2). Plaintiff initiated contact with the EEO Office on October 2, 2014. (EEO Compl., ECF No. 18-1). Thus, for Plaintiff to satisfy the remedy exhaustion requirement, the alleged discriminatory act must have occurred within the 45 day period between August 18, 2014 and October 2, 2014.

4

"[A] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007). Courts must liberally construe EEOC charges in determining whether remedies have been exhausted as to a particular claim. *Id.* However, a court's inquiry "is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge." *Id.*

"In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]" *Id.* "[T]his follows from the rule that each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Id.* (internal quotations omitted). Therefore, any discrete employment actions occurring after an EEOC charge are submitted are not exhausted. *Id.* "It is for the district court to determine whether the plaintiff has complied with the regulatory requirements when the defendant raises the issue of failure to exhaust administrative remedies." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105–06 (10th Cir. 2002).

Hostile work environment claims work differently, however. Under certain circumstances, hostile work environment claims may rely in part on conduct that occurred outside the limitations period. *Aman v. Dillon Companies*, Inc., 645 F. App'x 719, 723–24 (10th Cir. 2016). "[A]s long as an act contributing to a hostile work environment took place" within the limitations period, "a court may consider the complete history of acts comprising that hostile work environment." *Id.* at 724 (citing *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1308 (10th Cir.2005) (quotation

5

omitted)). "But to consider pre-limitations period conduct, those acts must comprise 'part of the same actionable hostile work environment practice' that continued into the limitations period." *Id.* (quotation omitted). "[A] series of alleged events comprises the same hostile environment where the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* (quotation and alteration omitted). Therefore, as long as Plaintiff has alleged at least one discriminatory act occurred between August 18, 2014 and October 2, 2014, the Court may consider the complete history of acts contributing to her hostile work environment claim.

Defendant argues that while Plaintiff alleges two incidents that allegedly occurred during this 45-day period, neither contributes to her hostile work environment claim. Defendant does not argue Plaintiff failed to timely exhaust her claims of retaliation or disparate treatment. The two claims Plaintiff alleges to have occurred within the relevant time period are: (1) in "early September 2014," SA Alexander created an operation plan and Plaintiff "realized that she was the only person not included in the plan who was at work that day," (Am. Compl. ¶ 69); and (2) on October 1, 2014, when Plaintiff received a second-hand account from TFO Roberts that "she heard SA Henry Sanin say to SA Aerts, "Let me lick your pussy." (EEO Compl. at 5-6).

It is clear that Plaintiff perceived her workplace as intolerable by September 14, 2014, at the latest—the date she tendered her resignation. Plaintiff frequently alleges SAs Tobar, Sanin, and Alexander were the primary contributors to the hostile work environment. Because Plaintiff alleges that she was excluded from an operation plan in "early September 2014," by SA Alexander, I find that this incident may have contributed

6

to her hostile work environment claim for exhaustion purposes.  Further, I find that Plaintiff was not required to exhaust administrative remedies with respect to all of the hostile work environment allegations because they were not discrete acts.  Thus, Defendant's Motion to Dismiss is denied as to this issue.

### C. Hostile Work Environment

Defendant argues Plaintiff's Amended Complaint fails to state a claim of hostile work environment.  To state a hostile work environment claim under Title VII, a plaintiff must, among other things, plead facts sufficient to show that the work environment "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted); *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).  A plaintiff must allege facts showing that the work environment "is both subjectively *and* objectively hostile or abusive" under this standard.  *Lounds*, 812 F.3d at 1222 (internal quotation marks and brackets omitted).  To meet the objective portion of this test, the alleged harassment must "be of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances."  *Id.*

"[P]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish an objectively hostile or abusive work environment, though these two grounds "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."  *Tademy v. Union Pac.*

*Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation marks and ellipses omitted). We also consider the totality of the circumstances in determining whether a work environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *accord Lounds*, 812 F.3d at 1222. "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quotation omitted). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.*

Finally, general harassment is not actionable, the harassment must be based on race or sex. *Bolden v. PRC, Inc.*, 43 F.3d 545, 550 (10th Cir. 1994), *cert. denied*, 516 U.S. at 826 (1995). Title VII does not establish "a general civility code," for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81(1998); *accord Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005). Accordingly, "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012). "Properly applied, [the standards for hostile work environment claims] will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788 (quotations omitted).

Plaintiff Marks alleges "she experienced a hostile work environment replete with inappropriate sexual comments." (Am. Compl. ¶ 19). Of Plaintiff's allegations, the following are the closest allegations based on sex: (1) that SA Sara Aerts, a female, brought a cake decorated as a penis into the office, offending TFO Dave See; (2) male SAs Sanin, Tobar, and Alexander behaved inappropriately and made repeated sexual comments around Plaintiff and other female employees; (3) after a conversation about another female agent's possible transfer to be closer to her boyfriend, SA Tobar stated, "good, I hope she quits, she can stay home in the kitchen"; (4) SA Tobar frequently made derogatory comments about women and their inability to effectively act as FBI agents; (5) SAs Sanin, Tobar, and Alexander mocked a female analyst, calling her "little Amish girl," and mocked her appearance; (6) other TFO agents overheard SA Tobar say "women belong in the kitchen," and "women shouldn't be FBI agents"; (7) Plaintiff's partner TFO Cooper reported that in a conversation between SA Tobar and SA Aerts, SA Tobar said, "come on Sara, show me your tits"; (8) in October 2014, after Plaintiff tendered her resignation, she received a second-hand report that SA Sanin said to SA Aerts, "let me lick your pussy"; (9) when male special agents made inappropriate comments, they looked at Plaintiff or SA Aerts and said, "I wonder how many zeroes will be at the end of that lawsuit check"; (10) in summer 2014, Lieutenant Torpin stated to Plaintiff and SA Aerts after leaving SSA Wilcox's office, "I don't think they like working with women"; and (11) Plaintiff and other female agents were routinely excluded from MGTF operations plans, particularly as part of the rescue team, and that SAs Tobar, Sanin, and Alexander stated it should be "left to the boys." (Am. Compl. ¶¶ 22, 30–34, 39, 41, 59, 60).

9

Many of the alleged sex-based comments were not, if ever, directed at Plaintiff. In fact, Plaintiff's Amended Complaint provides that "Ms. Marks was also told that soon after she resigned, Agent Tobar said, "I don't get why she's suing, all the stuff I said wasn't to her anyway." (Am. Compl. ¶ 107). Primarily, the only discrimination Plaintiff alleges she suffered is that SAs Sanin, Tobar, and Alexander would refuse to assist her with her cases, excluded her from operations plans they devised, treated her in a negative manner, did not invite her to lunch, and would show up to her and her partner's cases in the field to provide "an extra set of eyes." (*See generally* Am. Compl.).

Further, Plaintiff alleges that "[b]eginning in 2013," she informed SSA Wilcox about SAs Sanin, Tobar, and Alexander's conduct—which mostly consists of them not showing up to work, not helping her with her cases, and behaving inappropriately. Most of the allegations regarding these male agents concern their lack of support for Plaintiff's casework. (Am. Compl. ¶ 22). Plaintiff alleges that after complaining to SSA Wilcox about these issues, he assured her he would speak with these agents. (*Id.* at ¶ 27). Plaintiff alleges that after bringing this to SSA Wilcox's attention, "the agents' behavior became worse." (*Id.* at ¶ 28).

Plaintiff alleges that "SA Alexander admitted that he was not supporting Marks with her case." (*Id.* at ¶ 46). Plaintiff alleges that in early September 2014, "she was the only person not included in [SA Alexander's surveillance operations plan] who was at work that day." (*Id.* at ¶ 69). When she asked him about it, SA Alexander stated, "no, I don't need your help." (*Id.*). Plaintiff finally tendered her resignation on September 15, 2014, alleging that "the environment at the MGTF became so hostile and intolerable that it began to affect [her] mental health." (*Id.* at ¶¶ 70-71).

I find that the above facts, even construed in the light most favorable to Plaintiff, while inappropriate and offensive, were not sufficiently pervasive or severe to state a claim of sexual harassment. First, many of Plaintiff's allegations involved conduct that was directed at her other coworkers. Most, if not all, of the explicitly sexual comments made were not even made in Plaintiff's presence. Plaintiff's allegations largely rely on hearsay from her coworkers. To the extent Plaintiff alleges that the SAs repeatedly made sexual comments around her, she fails to include any details of what was said to, or around, her. Further, Plaintiff fails to plead facts to support her allegations that the three special agents would not support her cases or invite her to lunch were based on her gender. *See Dick*, 397 F.3d at 1265. Not only do these incidents appear to be isolated and not supportive of harassment directed at Plaintiff, but they also appear to be "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *See Faragher*, 524 U.S. at 788.

Importantly, Plaintiff's Amended Complaint alleges that SAs Sanin, Tobar, and Alexander's conduct only got worse after she complained to SSA Wilcox about their failure to support her cases. If retaliation was the male SAs sole motivation for this conduct, then it does not support Plaintiff's claim of gender-based harassment. *See Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 476 (8th Cir. 2010) (distinguishing between retaliation and discrimination claims under Title VII and concluding that retaliatory shunning by co-workers following sexual harassment complaint did not constitute sexual harassment); *Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 758 (7th Cir. 1998) (concluding "cold shoulder" from co-workers in retaliation for plaintiff's

participation in grievance process did not constitute sexual harassment); *see also Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 811 (7th Cir. 2001) (explaining that retaliation for complaints of sexual harassment has "too remote a connection to gender to convert the retaliatory harassment into gender-based harassment" (internal quotation omitted)).

The fact that Plaintiff's Amended Complaint and EEO Complaint are devoid of any allegations that sexual or gender-based comments were directed at her indicates any such comments were extremely isolated. In other words, I find that Plaintiff's allegations were too few and far between to be sufficiently severe or pervasive as to give rise to a sexual harassment claim. *See Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998) *cert. denied*, 527 U.S. 1039 (1999) (no hostile environment despite evidence of inappropriate comments and behavior by a male supervisor, including questioning whether women had wet dreams, attempts to look down the blouse of a female employee, and the fact eh intentionally gave hotel clerks the impression he was having one of the plaintiffs share his room).

Isolated incidents are sufficient to support a hostile work environment claim only when they are "threatening and severe" or "especially egregious or extreme." *Morris*, 666 F.3d at 666–67. Most incidents found to meet this standard involve some kind of physical assault. *See id*. (summarizing cases). Again, both Plaintiff's Amended Complaint and EEO Charge are devoid of any allegations of physical assault, sexual or otherwise. Thus, I find that Plaintiff's allegations do not rise to the extreme level of severe or pervasive conduct required for isolated incidents to give rise to a cognizable claim for a hostile work environment. While Plaintiff's work atmosphere may have been juvenile and unpleasant, she has failed to plead enough facts that nudge her complaint

12

from conceivable to plausible to state a hostile work environment claim. Therefore, I grant Defendant's motion as to Plaintiff's hostile work environment claim.

### D. Constructive Discharge

Defendant argues that Plaintiff has failed to state a claim of constructive discharge. In order to state a constructive discharge claim, the plaintiff must allege facts sufficient to show both that a hostile work environment existed and that this environment was "so intolerable that a reasonable person would have felt compelled to resign." *CHRISTOPHER A. BROWN, Plaintiff - Appellant, v. LAFERRY'S LP GAS CO., INC., Defendant - Appellee.*, No. 17-7008, 2017 WL 4149239 (10th Cir. Sept. 19, 2017) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 146-47 (2004)). The Tenth Circuit has undisputedly recognized that there must be some underlying Title VII violation to support a constructive discharge claim for damages. *See, e.g., Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 n. 12 (10th Cir. 2007) (where underlying Title VII claims failed before jury, any error in dismissing constructive discharge claim was harmless); *Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (in light of conclusion that employer did not otherwise violate Title VII, court could not conclude that plaintiff was subjected to constructive discharge)

"If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000) (quoting *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998)). Because Plaintiff Marks has failed to allege facts sufficient to establish a hostile work environment, she necessarily has failed to state a constructive discharge claim based on that environment. Accordingly, I find

that Plaintiff has failed to state a constructive discharge claim.

### E. Retaliation

Defendant argues that Plaintiff has failed to state a claim of retaliation. A plaintiff's failure to mark a box on an EEOC charge form "creates a presumption that she was not asserting claims represented by boxes not checked." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1260 (10th Cir. 1998). However, that presumption can be rebutted by the claim's text. *Id.* Although Plaintiff failed to check the "reprisal" box in her EEO Complaint, she did articulate the basis for her retaliation claim in the text of her complaint. (EEO Compl. at 1, 6). To establish a prima facie retaliation claim under Title VII, the text of a plaintiff's EEO claim must show: "(1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action." *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

First, Plaintiff provides that her last day of employment was September 30, 2014, two weeks after she tendered her resignation. (Am. Compl. ¶ 74; EEO Compl. at 1). Plaintiff's alleged protected activity includes: communicating her concerns about the SAs and workplace conduct to SSA Wilcox, reporting her allegations of hostile work environment during her September 30, 2014 exit interview with SAC Ravenelle, and contacting an EEO Counselor on October 2, 2014.

Plaintiff argues in her Response that she suffered adverse employment actions when the Supervisor of the MGTF, Mike Rankin, was placed in charge of her investigation, when her approval of outside employment was pending, when she was

constructively discharged, and when SSA Wilcox announced that she filed an EEO complaint. (ECF No. 36 at 13). For the reasons below, I find that Plaintiff has failed to allege an adverse employment action.

"An adverse employment action includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick*, 397 F.3d at 1268. Although "an adverse employment action is not limited to such acts ... we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Id*. It can be shown that the actions "might well have dissuaded a reasonable worker form making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (quotations omitted).

The Supreme Court has made clear, however, that the adversity must be material "because we believe it is important to separate significant from trivial harms." *Id*. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. Even if an employee resigns, as here, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged." *Fisher*, 525 F.3d at 980.

As noted above, I found that Plaintiff has failed to state a constructive discharge claim. Further, Plaintiff's Amended Complaint and EEO Complaint are devoid of any allegations that she was fired, not promoted, reassigned with significantly different responsibilities or that she suffered a significant change in benefits. What Plaintiff does

15

allege, however, is that SA Tobar, Sanin, and Alexander failed to support her cases and showed up to her jobs in the field uninvited. I find that these facts do not constitute more than a mere inconvenience.

Plaintiff herself alleges that in September 2014, she "received a monetary award for her efforts in gang investigation," negating the fact that a materially adverse employment action occurred. (Am. Compl. ¶ 18). Additionally,"[b]y its very nature, retaliatory conduct must come *after* the protected activity." *Kenfield v. Colorado Dep't of Pub. Health & Env't*, 557 F. App'x 728, 733 (10th Cir. 2014). Plaintiff's allegations that the three male special agents failed to support her cases occurred both before and after her protected activity. Thus, I find that these facts do not constitute a retaliatory adverse employment action.

Plaintiff further argues in her Response that "Ravenelle directed Marks to take a leave of absence using her own annual leave" and then "failed to provide her with either the authorization to work outside the FBI" or provide "any ideas as to when she would receive that authorization." (ECF No. 36 at 13). Plaintiff then argues that this "placed Marks in a precarious financial situation" because she faced "a potentially indefinite [period of] leave without pay" and the "possibility that she would forfeit a time sensitive employment opportunity." (*Id.*). I find Plaintiff's arguments without merit, as they directly conflict with the allegations made in her Amended Complaint and EEO Complaint.

According to Plaintiff's Amended Complaint, during her exit interview on September 30, 2014, SAC Ravenelle expressed that he "did not wish to lose a good agent" and "offered to transfer her to a different squad or to the New York field office."

(Am. Compl. ¶ 77). Plaintiff declined both options and "stated that she wanted to stay at MGTF and that the offending agents should instead be transferred." (*Id.*). SAC Ravenelle's response was that "it was unrealistic to transfer the offending agents out of the MGTF before he had an opportunity to investigate the issues." (*Id.*). Plaintiff further avers that SAC Ravenelle *asked* if she would be willing to take a leave of absence, but noted that she would first have to use her own annual leave. (*Id.*) (emphasis added). Plaintiff accepted this offer, but "only if it was clear she would return to the MGTF" and if "she could seek outside employment after her administrative leave was exhausted." (*Id.* at ¶ 78). Plaintiff explained that she needed approval for outside employment before October 13, 2014, because "she had tentatively accepted a part-time position as a speech pathologist." (*Id.* at ¶ 79).

A week later, on October 8, 2014, Plaintiff sent a follow up email to SAC Ravenelle regarding the status of her approval. (*Id.* at ¶ 88; EEO Compl. at 3). SAC Ravenelle responded that he could approve 30 days, but she could have up to 9 months with higher levels of approval. (EEO Compl. at 3). He then approved Plaintiff's leave without pay for 30 days, told her how to access the electronic request form, then detailed how the request would move up the chain. (*Id.*). SAC Ravenelle explained that the process "is not always [] quick," but "Bob Goffi advised he could call the unit back there and see if they will expedite it. We have no reason to believe it will not be approved, but HQ will have the final word on that." (*Id.*). Ultimately, however, Plaintiff decided that her already tendered resignation was final, not even two weeks after she made her approval request. (Am. Compl. ¶ 94).

Even construing her allegations most favorably to Plaintiff, she has failed to

17

allege any facts to indicate that her approval was delayed, if at all, for some retaliatory reason.  Moreover, Plaintiff's characterization that she was "directed" to take a leave without pay is without merit, especially in light of Plaintiff's allegations stating SAC Ravenelle "did not want to see a good agent leave the FBI."  (EEO Compl. at 2).

Additionally, the fact that ASAC Rankin was in charge of her internal investigation does not constitute an adverse employment action, and Plaintiff has failed to plead facts to support this decision was somehow retaliatory.  Plaintiff's Amended Complaint alleges that Rankin was the department's sole Assistant Special Agent in Charge.  (Am. Compl. ¶ 16).

Lastly, Plaintiff has failed to allege facts to support her assertion that SSA Wilcox's announcement that she filed an EEO complaint was a materially adverse employment action.  Plaintiff listed several names of personnel in her EEO Complaint that the EEO Office should contact during their investigation, including the special agents Plaintiff alleged to have carried out the discriminatory conduct.  Assuming her allegations are true, Plaintiff has failed to plead any facts that make it plausible that she suffered any materially adverse action by department personnel given notice of an imminent investigation.  This is especially so in light of the fact her last day of employment was September 30, 2014, before her contact with the EEO Counselor.

For the reasons stated, I find that Plaintiff has failed to plead a plausible claim of retaliation.  Therefore, Defendant's Motion is granted as to Plaintiff's retaliation claim.

### F. Disparate Treatment

Defendant's Motion argues that a disparate treatment claim may be implicit in Plaintiff's complaint.  In her Response, Plaintiff maintains for the first time that she has

18

alleged a plausible disparate treatment claim. To state a claim for disparate treatment on the basis of a protected characteristic under Title VII, a plaintiff must allege (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) she was treated differently from similarly situated employees. *Carney v. City & County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).

In pleading a disparate treatment claim, Plaintiff need not set forth a *prima facie* case for discrimination, but "she must allege facts that make such a claim at least plausible." *Mormon v. Campbell Cty. Memorial Hosp.*, 632 Fed.Appx. 927, 932-35 (10th Cir. 2015). To support a claim of disparate treatment, a plaintiff must allege and prove [s]he was similarly situated to other employees "in all relevant respects." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). *See also El Helbawy v. Pritzker*, 2015 WL 5535246, *9 (D. Colo. September 21, 2015).

Defendant challenges Plaintiff's ability to satisfy the second and third elements. Here, Plaintiff argues that the refusal of special agents to support her cases, her exclusion from job assignments, and her constructive discharge all constitute adverse actions for disparate treatment purposes. (ECF No. 36 at 11).

I find that Plaintiff has failed to plead a plausible claim of disparate treatment. Plaintiff largely relies on her constructive discharge theory to support her disparate impact claim. (*See* ECF No. 36 at 11-12). As stated above, I find that Plaintiff has failed to establish a constructive discharge claim.

19

Further, although Plaintiff alleges she was excluded from an operation plan devised by SA Alexander, and that the male SAs did not support her cases, she has failed to plead sufficient facts to show how this rises to the level to be a materially adverse employment action. Additionally, Plaintiff has failed to plead any facts to show that similarly situated employees were treated any better than she was. Plaintiff's argument that she has sufficiently pled a disparate treatment claim is undermined by the fact neither her Amended Complaint nor her EEO Complaint mention such a claim. Accordingly, Defendant's Motion is granted to the extent it seeks to dismiss Plaintiff's disparate treatment claim.

III. CONCLUSION

For the reasons stated herein, it is

ORDERED that Defendant's Motion to Dismiss (ECF No. 18), is **GRANTED.** Accordingly, it is

ORDERED that Plaintiff's Amended Complaint (ECF No. 7) is **DISMISSED.**

Dated: September 27, 2017.

BY THE COURT:

s/ Wiley Y. Daniel
WILEY Y. DANIEL,
SENIOR UNITED STATES DISTRICT JUDGE